UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-286 (DSD/SRN)

IKON Office Solutions, Inc.,
a corporation,

Plaintiff,

v. **ORDER**

Robert J. Dale, William J.
Dale, Terry R. Nissen, and
Computer Business Solutions, Inc.

Defendants.

Jeremy D. Sosna, Esq. and Littler Mendelson, 33 Sixth Street South, Suite 3110, Minneapolis, MN 55402-3720 and Lawrence H. Pockers, Esq. and Duane, Morris & Heckscher, One Liberty Place, Philadelphia, PA 19103, counsel for plaintiff.

Jeffrey P. Anderson, Esq., John Fabian, Esq. and Nichols Kaster & Anderson, 80 South Eighth Street Suite 4644, Minneapolis, MN 55402-2242, counsel for defendants.

This matter is before the court on plaintiff's request for leave to file a motion for reconsideration of this court's order of May 2, 2002, denying cross-motions for summary judgment.

Pursuant to Local Rule 7.1 (g), motions to reconsider are prohibited except by express permission of the court which will be granted only upon a showing of compelling circumstances. After reviewing the file and record, the court concludes that no compelling circumstance exists that justify reconsideration of the

FILED 5-14-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials ______

matter. See Local Rule 7.1(g). The court has considered the three "compelling circumstances" that plaintiff raises in its letter dated May 8, 2002, and does not consider any of these circumstances warrant the granting of a motion to reconsider this court's previous order. If necessary, these are issues that can be addressed and clarified at the time of trial.[1]

Accordingly, **IT IS HEREBY ORDERED** that plaintiff's request to file a motion for reconsideration is denied.

Dated: May 14, 2002

David S. Doty, Judge
United States District Court

[1] If plaintiff is seriously concerned with the "considerable burden and expense" involved in pursuing this matter to trial, perhaps the next settlement conference will provide plaintiff a means to purge these concerns.

LITTLER MENDELSON

RECEIVED
MAY 0 9 2002
BY:

May 8, 2002

Jeremy D. Sosna
Direct: 612.313.7610
Direct Fax: 612.630.9626
jsosna@littler.com

**BY HAND DELIVERY**

The Honorable David S. Doty
U.S. District Courthouse
300 South Fourth Street
Minneapolis, MN 55415

***Re: IKON Office Solutions, Inc. v. Robert J. Dale, et al.***
***Court File No. 01-CV-286 DSD/SRN***

Dear Judge Doty:

In accordance with Local Rule 7.1 (g), I respectfully submit this letter on behalf of Plaintiff to seek the Court's permission to bring a motion for reconsideration of the Court's Order of May 2, 2002 denying IKON's Motion for Summary Judgment.

IKON seeks reconsideration of the Court's Order only to the extent that it applies to Defendants' sale and servicing of analog copiers (i.e., the "old fashioned" copiers that cannot be connected to a computer or computer network - - See Exhibit "A" hereto, excerpt from Dep. Tr. of Robert J. Dale, previously submitted as Exhibit "H" to Affidavit of Lawrence H. Pockers in support of IKON's Motion for Summary Judgment, at p. 20). Three compelling circumstances warrant reconsideration at this time.

First, the interest of judicial economy strongly supports reconsideration of the Court's Order insofar as it relates to Defendants' sale and serving of analog copiers. By Defendants' own admission, analog copiers have no relationship whatsoever to computers (See Exhibit "A" at pp. 8, 20) and, therefore, by definition cannot be "exclusively and directly related to computer equipment," or "directly related products or peripherals" of computer equipment. (See Exhibit "B" hereto, Purchase and Sale Agreement at preamble, ¶ 1.2). There is also no dispute that Defendants have sold and serviced analog copiers during the time period between June 1, 1998 and June 1, 2001. (See Exhibit "A" at pp. 79-80 - - identifying analog copiers serviced by CBS, Inc. with reference to Defendants' own business records). Accordingly, unless the Court reconsiders this discrete and limited aspect of its Order, precious time and judicial resources will be wasted at trial on matters that are not genuinely in dispute between the parties.

Second, the need for clarification of the issues for trial is a compelling circumstance warranting reconsideration of the Court's Order as it applies to Defendants' sale and servicing of analog copiers. The Court's Order generally refers to "a dispute of material

fact" which could properly refer only to the one issue actually contested by Defendants - - involving Defendants' sale and servicing of digital copiers - - but not to Defendants' sale and servicing of analog copiers because that issue has not been disputed and nowhere in the record is there any basis for any such dispute (indeed, as evidenced at Exhibit "A", Defendants have unequivocally admitted that there exists no such dispute). Without clarification of the Court's Order relating to Defendants' sale and servicing of analog copiers, both parties will be forced to incur the considerable burden and expense of preparing for trial as to analog copier transactions that are not properly in dispute.

Finally, reconsideration of the Court's Order is warranted in order to help facilitate possible settlement of this case. Such an interest is compelling and, indeed, is explicitly recognized in the Federal Rules of Civil Procedure. See F.R.Civ. P. 16(a)(5). If Defendants can promote the Court's Order to suggest that analog copier sales remain an open issue, practical and realistic settlement discussions will be thwarted, the resources of the parties and the Court wasted, and justice will be significantly impeded.

I look forward to the Court's response to this request. Should you have any questions, please do not hesitate to contact me. Thank you for your kind attention to this matter.

Very truly yours,

Jeremy D. Sosna

JDS/lz

Enclosures

cc: John A. Fabian, Esq., via telecopier and u.s. mail

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MINNESOTA

---

IKON OFFICE SOLUTIONS, INC.,

Plaintiff,

vs.

ROBERT J. DALE, WILLIAM J. DALE,
TERRY R. NISSEN, and COMPUTER
BUSINESS SOLUTIONS, INC.,

Defendants.

COPY

CIVIL ACTION
No. 01-286 (DSD/SRN)

---

C O N F I D E N T I A L

DEPOSITION OF

ROBERT J. DALE

Taken December 18, 2001
Commencing at 9:00 A.M.

REPORTED BY: DEBORAH A. MAVES, RPR

PARADIGM REPORTING & CAPTIONING
527 MARQUETTE AVENUE
SUITE 1400
MINNEAPOLIS, MINNESOTA 55402
(612)339-0545

ROBERT J. DALE,
duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. POCKERS:
Q. All right, Mr. Dale, again my name is Lawrence Pockers. It has been a while since we last spoke in this setting. I want to go through some -- I want to go through the instructions that I gave you during your first deposition but do it rather quickly this time around since you have sat in a deposition in this case before.
If you don't understand any of my questions, I want you to stop me, let me know you don't understand, because if you give me an answer, I'm going to assume that you understood the question. Okay?
A. Okay.
Q. I'm going to need you to answer all questions verbally as opposed to using hand gestures or nods of the head. Okay?
A. Okay.
Q. I'm going to need you to answer all questions completely and accurately. Okay?
A. Okay.
Q. If you realize that you gave an incomplete or an inaccurate answer to a previous question, again stop me,

multifunction machine could do one or more of the following functions: It could copy, it could print, or it could serve as a facsimile?
A. Yes.
Q. Are there any additional functions which a multifunction machine could perform other than those three?
A. Was it three?
Q. Well, we had talked about copying, printing and serving as a facsimile.
A. Yes.
Q. Are there any additional functions that a multifunction machine might be capable of performing?
A. Scanning.
Q. What else?
A. That's all I can think of off the top of my head.
Q. And if I were to use the term "single function" to mean a machine that could perform just one of these functions, in other words it could either perform copying, printing, fax or scanning, would you understand that?
A. That's your definition of single function, is that what you're saying?
Q. Yes.
A. I'll understand that if you use that.



let me know which question it was, we can go back and fix that answer. Okay?
A. Okay.
Q. Do you understand these instructions?
A. Yes.
Q. Do you see any reason why your deposition shouldn't go forward today?
A. No.
Q. Mr. Dale, have you ever heard the term "single function" applied to describe copier, printer or facsimile?
A. You know, I don't believe I have. Single function.
Q. Never heard that term?
A. No.
Q. What about the term "multifunction"?
A. Yes.
Q. What does the term "multifunction" mean?
A. It would mean that it can do a multitude of functions depending on the equipment.
Q. And what type of functions are we talking about depending on whether it be a copier, printer or facsimile?
A. Those. Those would be the functions.
Q. Okay, so if I understand your answer correctly, a

Q. Now, there are copiers that would under my definition of single function qualify as single-function copiers, correct?
A. That would be analog copier.
Q. So in other words, an analog copier is a copier that can only make copies?
A. Yes.
Q. Can't serve as a facsimile, correct?
A. Right.
Q. Can't serve as a printer, correct?
A. Correct.
Q. Can't serve as a scanner?
A. Correct.
Q. A single-function printer is a machine that can only serve as a printer similarly?
A. Yes.
Q. A single-function facsimile is a machine that could only serve as a facsimile?
A. I don't believe so.
Q. What other functions could --
A. A facsimile can always copy.
Q. So there would be no facsimile that could serve only the one function of being able to fax documents under your definition?
A. As far as I know.

17

Q. Yes.
A. I'm sorry. That is vague, I really --
Q. Okay, anytime, just so we're clear as we move forward today, anytime there's an objection, okay, unless your counsel instructs you not to answer, you have to answer the question, all right, Mr. Dale?
A. Right.
Q. Do you want me to repeat the question?
A. Yes.
Q. Let me ask it this way instead: Of these four categories, would all copiers, printers and facsimiles fall into one of these four categories?
A. I don't know.
Q. Now, what do you mean you don't know?
A. I, you know, I don't know. You know, there may be some other thing out there, I don't know. I don't know everything there is to know about this business. You know.
Q. Based on your knowledge, are there any copiers, printers or facsimiles that would fall into a category other than the four that you referenced?
A. Not that I can think of.
Q. Now, again, with reference to these four categories, are there any copiers, printers or facsimiles that would fall into more than one of the categories that

18

you're aware of?
A. I'm going to ask if you would repeat that question for me.
Q. Sure. Would you like me to repeat the categories again, would that help?
A. No, I think the question would be adequate.
Q. Okay. Are there any copiers, printers or facsimiles on the market today that you're aware of that would fall into more than one of these four categories?
A. Not that I know of.
Q. Sir, you'd agree that there's a difference between a copier and a facsimile, correct?
A. Not necessarily.
Q. Well, how would there not be a difference between a copier and a facsimile?
A. Well, they both can produce copies. One has the ability to fax.
Q. And that would be of course the facsimile?
A. Right.
Q. So there are differences between a copier and a facsimile?
A. Yes.
Q. You'd agree that there's a difference between a facsimile and a printer, wouldn't you?
A. Not necessarily.

19

Q. Okay. Again, why specifically wouldn't you agree with that statement?
A. Because you can have a printer/fax.
Q. What are the differences between a fax and a printer?
A. I guess there isn't a lot of difference.
Q. Well, what is there that is different?
A. I don't know.
Q. So is it your testimony that there's no difference between a facsimile and a printer?
A. That's right.
Q. Is there any difference between a copier and a printer?
A. Are you speaking of an analog copier?
Q. I'm speaking of a copier in general and a printer.
A. I can't answer that question.
Q. Okay, why can't you answer that question?
A. Because I can't answer it.
Q. Well, I'm trying to help you out here. Why specifically, what about that question makes it impossible for you to answer?
A. Well, if we're talking about an analog copier, there is a difference.
Q. So there's a difference between an analog copier

20

and a printer?
A. Right.
Q. And what is that difference?
A. An analog copier cannot be connected to a computer.
Q. What about is there any difference between a digital copier and a printer?
A. No.
Q. Now, we've talked about analog and digital copiers. Analog and digital are descriptive terms used to describe copiers, correct?
A. They're descriptions to describe -- in my mind a copier is analog; the digital printer/copier is digital connected to computers.
Q. What does analog mean?
A. You know, I really don't know.
Q. What does digital mean?
A. Digital to me means the ability to be able to connect it to a computer because it is digital. Analog, I don't know what that, you know, what that term means.
Q. Isn't it true that the primary function of a copier is to produce multiple copies of documents from either hard copy or digital sources?
A. Repeat that question exactly.
Q. Sure. Isn't it true that the primary function of

A. Yes.
Q. So in other words, that means the number of copiers included on the customer's maintenance plan?
A. The number of copies.
Q. Copies, correct. I'm sorry if I stated otherwise.
And then looking again at 0070 now. Sorry to keep on jumping back and forth.
A. All right.
Q. Again the first column is, or not again, but the first column is "OVG," correct?
A. Yes.
Q. And is it your understanding that that stands for overage?
A. Yes.
Q. So, if you were to correspond the first line entry on 0066 with the first line entry on 0070 like we did a moment ago, is it your understanding that 21st Century Bank pays $32.50 for 2500 copies per month and then pays .013 cents for any copies over 2500 in a month?
A. That's the way I would understand it.
Q. And is it your understanding that the last two columns entitled "OVG Serv, OVG Supply" are short for overage service, overage supply?
A. Yes.



Q. And again would that be something that CBS does so that it can allocate profit and loss between service and supplies?
A. Yes.
Q. So in other words, again the customer doesn't know what percentage of that .013 overage is allocated to service as opposed to supplies?
A. They wouldn't, no.
Q. Now, I previously asked you with reference to the first page of this document whether you could identify how many of the listed machines were previously sold or leased to the customers by IKON. I'd like you to take a look at the entire document now and let me know which ones you can identify as being sold or leased by IKON.
A. I wouldn't want to take a guess on any of them. It's been too long of a period. I wouldn't trust my accuracy at that.
Q. So looking over this document, you can't say for sure that any of the machines listed were sold or serviced by IKON?
A. I can't say that any of them were. You know, I could take guesses at it, but I don't think that's what you want.
MR. FABIAN: I don't want it.
Q. I don't want you to guess, Mr. Dale. You do



acknowledge though that at least some of the machines listed on this document were machines that were sold or leased to the customer by IKON, correct?
A. I can't guess at that.
Q. So you don't know?
A. I really can't say for sure.
Q. All right, sir, looking at the column entitled "Machine Description" on this document.
A. Yes.
Q. Could you identify which machine -- strike that. Looking at the first line entry, the Minolta DI-250, okay. The Minolta DI-250 is a digital copier, correct?
A. Yes.
Q. Do you see the seventh entry where it says "Toshiba 1570"?
A. Yes.
Q. Is that a digital copier?
A. Yes.
Q. Can you identify any copiers on this first page that are analog copiers?
A. Well, I'm not sure on the numbers. So, you know, I think that if we go down the list and if it doesn't say DI with a Minolta, that it would be analog. So all the rest, the Konicas, the Toshibas, are all digital.
Q. So in other words, all of the machines beginning



with Minolta EP are analog machines?
A. Yes.
Q. Taking a look at the digital machines that are listed on this document and specifically the ones with an install date indicating that CBS sold or leased the customer the machine, how many can you specifically identify as currently being connected to a computer network or a stand-alone computer?
A. I wouldn't know.
Q. Okay, can you point to any specific one example of one of these customers whose digital machine that CBS sold or leased to the customer has that machine connected right now?
A. What I'm saying is that I can't recall just from this list each and every one that's connected. I would say, you know, and again, I don't think I should be expected to remember each and every one that's connected.
Q. What about not with reference to this list but today, sitting here, can you think of, can you specifically identify a single customer that CBS has sold a digital copier to, sold or leased a digital copier to, where the customer has that digital copier connected to a network or a stand-alone computer?
MR. FABIAN: Objection, asked and answered.
Go ahead.

# PURCHASE AND SALE AGREEMENT
Mankato Computer Business

AGREEMENT, dated as of this 30th day of September 1999 by and among Robert Dale, personally and individually, and Computer Business Solutions, Inc. a Minnesota Corporation ("CBS"), jointly and severally (the "Buyer"), and IKON Office Solutions, ("Seller"), (Mankato Minnesota Marketplace).

WHEREAS, Seller owns assets which is engaged, in addition to other businesses, in the business of sales, leasing and servicing of computer equipment including directly related products, peripherals, service agreements and supplies in the Mankato, Minnesota Markeplace (hereinafter generally referred to as the "Business");

WHEREAS, pursuant to the terms and conditions hereof, Seller desires to sell and Buyer desires to purchase certain identified assets of the Business and assumes the liabilities of the same;

NOW, THEREFORE, in consideration of the mutual representations, warranties and covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Purchase and Sale of Assets.</u>

1.1 <u>Assets to be Purchased.</u> Upon the terms and subject to the conditions contained herein, Seller shall convey to Buyer and Buyer shall purchase and acquire from Seller at the Closing (as defined in Section 4.1 hereof), all of Seller's right, title and interest in and to the following properties and assets of Seller used exclusively in the Business described above which business has been situated at 1715 Commerce Drive, North Mankato, MN 56003 as the same exists as of the Closing Date (hereinafter collectively referred to as the "Transferred Assets"):

(a) Seller's inventory of computers and all related accessories, parts and supplies, as described and listed on the attached Exhibit A (hereinafter the "Inventory");

(b) The furniture and fixtures used by Seller in the Business, as described and listed on the attached Exhibit C (hereinafter "Furniture and Fixtures"); and the equipment used by Seller in the Business, as described and listed on the attached Exhibit C (hereinafter "Equipment") and

(c) All customer maintenance contracts and service agreements, directly relating to the conduct of the Business including the stream of payments under all such contracts and agreements, (hereinafter "Maintenance Contracts"), and any consents, assignments or renewals necessary to transfer the Maintenance Contracts;

(d) All of Seller's customer files, records of customer accounts, and customer lists used in connection with the Business, including names, addresses and purchase history. All such information needed by Seller in the conduct of its business remaining after the sale of the Business the Buyer shall remain with Seller and shall be released by Seller to Buyer if and as required for the conduct of the Business.

1.2 <u>Assets to be Retained.</u> Any asset not specifically listed in 1.1 above as Transferred Assets shall remain the sole and exclusive property of Seller, which shall include, but are not limited to: (a) the consideration paid hereunder to the Seller or any other rights of the Seller pursuant to this Agreement; (b) other businesses of the Seller other than the Business including the business conducted relating to copiers, facsimiles, typewriters and all other activities and Products which are not exclusively and directly related to computer equipment, and service of the same; and (c) any cash on-hand



MankDivIc
DCP
9-29-99

as of the Closing Date, (d) any and all trademarks, tradenames, logos and other means of identifications used by Seller in the conduct of its business. Buyer shall not have the right to utilize the name "IKON", "Technology Services" or any other trademark or tradename of Seller or any derivation of the same in the conduct of Business.

2. Assumption of Liabilities.

2.1 Liabilities Assumed. Both of the Buyers, jointly and severally, hereby assume and agree to pay and discharge as the same become due only the service and maintenance obligations under the Maintenance Contracts, as of the Effective Date, all payables, liabilities and obligation's arising or relating to the conduct of the Business subsequent to the Effective Date, (except trade payables to vendors for Inventory and goods and services received and incurred prior to the Effective Date) including but not limited to third party claims for goods delivered or services performed related or arising from the Conduct of Business. Buyer shall further assume and pay on a timely basis any and all taxes related to the conduct of the Business subsequent to the effective date.

2.2 Excluded Liabilities. It is specifically understood by the parties hereto that Buyer does not assume any liability not expressly assumed by Buyer hereunder, which excluded liabilities include but are not limited to: (i) any liabilities or obligations of the Seller arising from or relating to the conduct of any of its operations other than the Business prior to or after the Effective Date, (ii) any liability for the payment of federal, state or local taxes related to the Business prior to the Effective Date; (iii) any liability or expenses incurred by the Seller in accomplishing this transaction; (iv) any liability relating to the employment and termination of the Seller's employees and (v) trade payables to vendors for Inventories and goods and services received and incurred prior to the Effective Date.

3. Consideration.

3.1 Purchase Price. The purchase price for the Transferred Assets shall be determined and allocated as attached in Exhibit B.

Exhibit B and Net Price shall be subject to final adjustment based upon the books and records of Seller as of the beginning of the Effective Date as determined by Seller which adjustment of Purchase Price should be paid or reimbursed at the time of closing.

3.2 Non-compete. In addition, in consideration of Buyer entering into a non-competition covenant, more fully defined and set forth in Section 10 herein as part of this Agreement as well as an Agreement terminating his employment as hereinafter described. Seller agrees to pay and shall deliver to Buyer at Closing, by check or wire transfer, an aggregate sum of Fifty Thousand Dollars ($50,000). The parties hereby agree that such non-compete allocation represents the result of their economic negotiations relative to this transaction. Seller does not make a commitment not-to-compete with Business.

4. Closing; Deliveries at Closing.

4.1 Closing Date. The Closing shall take place on the date hereof at the offices of the Buyer's attorney Ronald Moersch in Northfield, Minnesota, or at such other place and time as may be agreed upon by the parties hereto (the "Closing Date"). The transfer of the Transferred Assets shall be deemed to have taken place as of June 1, 1998 ("Effective Date").

4.2 Deliveries. At the Closing, the parties hereto shall make the below described deliveries, provided the obligation of each to do so shall depend upon the performance of the other parties of their obligations hereunder:



MankDivle
DCP
9-29-99

(a) Seller shall deliver, or cause to be delivered, to Buyer a bill of sale and other good and sufficient instruments of transfer and conveyance as shall be effective to vest in Buyer good and marketable title to the Transferred Assets; and such other instruments of assignment, transfer, conveyance, endorsement or authorization as shall be sufficient to vest in Buyer all of the Seller's right, title and interest in and to the Transferred Assets.

(b) Buyer shall deliver to the Seller a certified check or cash in the amount specified in Section 3 above net of the sum to be paid to Buyer pursuant to Section 3.2 above.

5. Representations and Warranties of Seller.

Seller represents and warrants the following to Buyer as of the Closing Date;

5.1 Valid and Binding Agreement. This Agreement constitutes a valid and binding obligation of the Seller in accordance with its terms.

5.2 Title to Properties. The Seller has good and marketable title to all of the Transferred Assets, free and clear of all liens and encumbrances, except as to those assets where the Seller has a leasehold interest and liens for liabilities assumed by Buyer hereunder.

5.3 All Transferred Assets and Assumed Liabilities as well as all aspects of the Business are made and transferred to Buyer "as is" and "where is" it being understood and agreed that Buyer has managed the Business for and on behalf of Seller and is more knowledgeable and familiar with the same than Seller. Seller shall not be obligated to Buyer for any breach of any covenant hereunder where Buyer has knowledge of the same.

5.4 Survival. These representations and warranties are true and complete as of the Closing Date and shall survive the Closing.

6.0 Representations and Warranties of Buyer.

Buyer represents and warrants the following to Seller as of the Closing Date:

6.1 Finders. No broker's, finder's or any similar fee shall be incurred by, or on behalf of, Buyer in connection with the origin, negotiation, execution or performance of this Agreement or the transactions contemplated hereby.

6.2 Survival. These representations and warranties are true and complete as of the Closing Date and shall survive the Closing.

7.0 Buyer's Inspection and Knowledge of the Business. Buyer has managed the Business for Seller and has availed itself of the opportunity to review all books and records of the Business that more particularly describe and enumerate the Transferred Assets, and the conduct of the Business and has had full opportunity to inspect the Furniture, Fixtures, Equipment and Inventory. Buyer, after reviewing and testing those records, and inspecting the Furniture, Fixtures, Equipment and Inventory, is satisfied that the valuations thereof are materially fair and accurate and that such items are operational and accepts the Transferred Assets, liabilities and Business "as is" and "where is".

8.0 Employment of the Company's Employees. Buyer, shall employ all of the employees currently employed by the Seller in the conduct of the Business which consists of the employees named in Exhibit D attached hereto. Such employment will be on terms and conditions substantially similar to the terms of employment each has had with Seller through the Effective Date, provided however it is

understood and agreed that Buyer shall not be required to offer a 401K plan. The Seller shall be responsible for any pension and/or profit sharing payments, severance, accrued vacation, sick pay, bonuses, or any other similar payments of its employees only through the date of termination by Seller which shall be as of the Effective Date. It is understood and agreed that Buyer will cause the employees to voluntarily terminate their employment with Seller.

9.0 <u>Indemnification.</u>

9.1 <u>Indemnification by Buyer.</u> Provided the sale of the Transferred Assets hereunder is consummated, Buyer shall defend, indemnify and hold harmless Seller from and against all losses, claims, demands, causes of action, suits, deficiencies, judgments, debts, liabilities, damages and expenses (including reasonable attorneys' fees) arising from any misrepresentations, breaches of warranty or nonfulfillment or breach of any condition or obligation on the part of Buyer under this Agreement.

9.2 <u>Indemnification by Seller.</u> The Seller agrees to defend, indemnify and hold harmless the Buyer, from and against all losses, claims, demands, causes of action, deficiencies, suits, judgments, debts, liabilities, damages and expenses (including reasonable attorney's fees) arising from: (1) any misrepresentations, breaches of warranty or nonfulfillment of any condition or obligation on the part of Seller under this Agreement; (b) any liability of Seller not assumed by Buyer hereunder; and (c) Seller's conduct of the Business before Closing.

10. <u>Employment Termination and Non-Compete.</u> It is understood and agreed that Buyer's employment with Seller shall terminate as of the Effective Date hereof. In consideration of the sum of $50,000 to be paid Buyer at closing, as provided in Section 3.2 hereof and not in addition to the same, Buyer agrees to voluntary separate from Seller's employment and waives any and all claims relative to such employment. Buyer further agrees that he will not compete with the business as the same is conducted by Seller throughout the United States and Canada except for the conduct of Business as described herein by Buyer which shall be limited to the geographical area being the city of Mankato, Minnesota and the area which is located within the southern most ~~150~~ miles of the state of Minnesota which in any event shall not include the 7 county Minneapolis, St. Paul Metropolitan area nor the Rochester, Minnesota metropolitan area. Buyer and Seller will enter into the Letter Agreement in the form attached hereto as Exhibit E pertaining to the termination of Buyers' employment with Seller and which provides for confidentiality, non-solicitation of employees and covenant not to compete.

To the extent that the foregoing agreement to allow Buyer to conduct the Business within the area described above the non-competition covenant entered into between Robert Dale and Alco Standard Corporation as contained in that certain Plan and Agreement of Reorganization dated December 5, 1995 is hereby deemed amended solely for that limited purpose.

Buyer acknowledges that the consideration for such undertakings including the covenant not-to-compete is adequate and that the scope of such covenant in terms of geographical and time limitations are reasonable.

11. <u>Premises.</u> Buyer is the owner of the premises located at 1715 Commerce Drive, North Mankato, MN 56003, in which Seller conducts its business including the Business. Such lease currently in effect shall be terminated and the same shall be replaced by a lease to Seller for approximately one-half of such premises at the current rental rate for a period of three (3) years from the Effective Date. The Buyer and Seller shall have the option to terminate the lease with 90 days written notice to the other party.. Buyer shall install a dividing wall to separate the premises leased to Seller from the premises to be occupied by the Business, the cost which wall will be reimbursed to Buyer by Seller which cost will be subject to Seller's approval and shall not exceed $25,000. Such wall and the configuration and location of the leased premises are to be approved by Seller in advance. The parties shall execute and deliver that lease in the form attached hereto as Exhibit F as of the date of Closing.

12. Miscellaneous.

12.1 Assignability. Neither this Agreement nor the benefits thereof may be assigned, transferred, or conveyed by Buyer without the prior written consent of Seller. It is agreed that Buyer, Robert Dale, may cause the conveyances to be made hereunder to include Buyer, Computer Business Solutions Inc., a corporation which is wholly owned and controlled by Buyer. Robert Dale shall in such event remain fully responsible for all of Buyers covenants and obligations hereunder.

12.2 Severability. Each Section, subsection and lesser section of this Agreement, constitutes a separate and distinct undertaking, covenant and/or provision hereof. In the event that any provision of this Agreement shall finally be determined to be unlawful, such provision shall be deemed severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

12.3 Expenses. Buyer and Seller shall each pay their own expenses incidental to the negotiation, preparation and performance of this Agreement and the transactions contemplated hereunder, whether or not such transactions are consummated.

12.4 Exhibits; Entire Agreement. All Exhibits hereto are incorporated herein by reference and made a part hereof. This Agreement constitutes the entire Agreement concerning the subject matter hereof. No modification or waiver hereof shall be binding upon any party unless in writing and signed by or on behalf of the party against which the modification or waiver is asserted.

12.5 Notices. Any notice hereunder shall be deemed to be duly given if sent by prepaid first class registered mail to:

| | |
|---|---|
| (1) Buyer at: | Copy to: |
| Computer Business Solutions, Inc.<br>and Robert Dale<br>1715 Commerce Drive<br>North Mankato, MN 56003 | Ronald L. Moersch<br>Hvistendahl & Moersch<br>311 South Water Street P. O. Box 651<br>Northfield, MN 55057-0651 |
| (2) Seller at: | Copy to: |
| IKON Office Solutions, Inc.<br>Mankato Minnesota Marketplace<br>John Hey, President<br>2740 W 80th Street<br>Minneapolis, MN 55431 | IKON Office Solutions, Inc<br>Upper Midwest CSC<br>Dan Haugen, Vice President<br>3600 West 80th Street, Suite 300<br>Minneapolis, MN 55431 |

or to such place as any party wishing to change its address may from time to time designate in writing.

12.6 Governing Law. This Agreement shall be construed under and governed by the laws of the State of Minnesota.

12.7 Successors and Assigns; Other Parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, and personal representatives. Except as specifically provided elsewhere herein, nothing herein shall entitle any person other than the parties hereto and their respective successors, assigns, heirs and personal representatives, to any claim, cause of action, remedy or right of any kind.

12.8 Further Assurances. At any time from time to time after the Closing, the parties shall execute and deliver such other instruments and take such other action as may be reasonably required to accomplish the transactions contemplated by this Agreement.

12.9 Counterparts. This Agreement may be executed in two or more counterparts, any or all of which shall constitute one and the same Agreement.

(The remainder of this page is intentionally left blank)

There shall be no contractual commitments relating to the Business unless and until this Agreement is executed and delivered by both parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date and year first above written.

Buyer:

Robert Dale, Individually and Personally

Seller:
IKON Office Solutions, Inc.
(Mankato Minnesota Marketplace)
By: ______
It's: Vice President

______
Witness

Computer Business Solutions, Inc.
by: ______
It's: President

| | |
|---|---|
| Exhibit A: | Inventory |
| Exhibit B: | Settlement Sheet |
| Exhibit C: | Furniture, Fixtures and Equipment |
| Exhibit D: | List of Current Employees |
| Exhibit E: | Separation Agreement |
| Exhibit F: | Lease |



MankDivlc
DCP
9-29-99

TOTAL P.08